**UNITED STATES of America,**

v.

**Matthew IANNIELLO, et al.,
Defendants.**

**No. SSS 86 Cr. 245 (PNL).**

United States District Court,
S.D. New York.

April 26, 1990.

**174**

Otto Obermeier, U.S. Atty., New York City (Alan M. Cohen, Asst. U.S. Atty., Mark R. Hellerer, Asst. U.S. Atty., of counsel), for the Government.

Jay Goldberg, New York City (Judd Burstein, New York City, of counsel), for defendant Matthew Ianniello.

John Jacobs, New York City, Anthony Cardinale, Boston, Mass., for defendant Anthony Salerno.

Gustave H. Newman, New York City, Michael Tigar, Austin, Tex., for defendant Vincent DiNapoli.

Robert L. Ellis, New York City, Kaplan, Russin & Vecchi, Washington, D.C. (Michael Abbell, of counsel), for defendant Louis DiNapoli.

Miller, Lewin, LaRocca & Cassidy, Washington, D.C. (Herbert Miller, Stephen Braga, of counsel), Segal & Hundley, New York City (Marvin B. Segal, of counsel), for defendant Nicholas Auletta.

Goldman & Hafetz, New York City (Frederick Hafetz, Susan Necheles, of counsel), for defendant Edward Halloran.

Albert A. Gaudelli, Flushing, N.Y., for defendant Aniello Migliore.

Henry Putzel, New York City, for defendant Richard Costa.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

BRIEANT, Chief Judge.

Pursuant to a Mandate of the United States Court of Appeals for the Second Circuit, docketed in the Southern District of New York on February 23, 1989, which vacated and remanded a prior order of this Court (Judge Lowe), reported at 698 F.Supp. 1109 *sub nom United States v. Salerno* (SDNY 1988), denying a new trial to defendants Matthew Ianniello, Vincent DiNapoli, Louis DiNapoli, Nicholas Auletta, Edward J. Halloran, Aniello Migliore, Anthony Salerno, Richard Costa, and Alvin O. Chattin, the District Court was directed to hold further proceedings on remand consistent with the panel opinion of the Court of Appeals for the Second Circuit in this case, decided January 18, 1989 and reported at 866 F.2d 540.

Evidentiary hearings were held before this Court on April 13, 14, 27 and 28, and December 21, 1989. The matter has been fully submitted as of March 23, 1990. The Court now sets forth below its findings of fact and conclusions of law, and its decision with respect to the motion for a new trial and the matters directed to be adjudicated by the Court of Appeals.

This Court concludes that the moving defendants have failed to prove that there were any improper ex parte contacts with the jury or that the verdicts were tainted as claimed. Also, no necessity is shown to require the oral testimony of the trial judge. The motions are denied for the reasons set forth below.

Our decision should begin by invoking the usual literary convention of the modern

federal court to the effect that "the familiarity of the reader with all prior proceedings herein is assumed." Such an assumption here would be preposterous because we write in the aftermath of a more than thirteen month criminal jury trial conducted before Judge Lowe. We have considered all portions of the trial record which were cited to us at the evidentiary hearings and, in addition, such portions as are specifically referred to below. We doubt that anyone can be "familiar with all prior proceedings" in a matter of such length and magnitude as this but assume with confidence familiarity of the reader with the panel opinion of the Court of Appeals at 866 F.2d 540 and the opinion of Judge Lowe, *supra*, denying a new trial.

Indictment SSS 86 Cr. 245, filed on April 7, 1988, charged a total of eleven defendants in 35 counts. The Indictment charged that, from April 1970 to April 1987, the defendants led, managed, and participated in a racketeering enterprise known as the Genovese Family of La Cosa Nostra (the "Genovese Family"), a secret criminal organization, by committing and agreeing to commit numerous crimes. The defendants include alleged leaders of the Genovese Family, as well as several businessmen who allegedly became their partners and assisted the Genovese Family in infiltrating businesses in the New York City area and nationwide.

Following more than thirteen months of trial, jury verdicts of conviction were returned against the moving defendants on May 4, 1988 for violations of the RICO statute, 18 U.S.C. § 1961 et seq., and various underlying offenses. The jury convicted nine and acquitted two of the eleven defendants, failing to agree on four predicate racketeering acts found in the RICO allegations. The trial had a second phase involving forfeitures during which the already exhausted jurors were instructed as to the additional facts which needed to be found to dispose of the forfeiture allegations in the Indictment. The jury granted the government's application for forfeiture except with regard to some of the interests of defendants Salerno, Auletta, and Halloran. The initial deliberation to reach the verdicts on the criminal counts extended over nine days. An additional two days of deliberation were required for the forfeiture phase of the jury trial.

After the verdicts were returned, defendants moved for a new trial and for recusal of the trial judge in deciding the motion, claiming that they had been denied a fair trial because of ex parte communications between the Judge and jury and an improper statement by a Deputy United States Marshal to the jury. In support of their motion, the defendants submitted the affidavits of three jurors, Joyce Domingo, Helen Talley, and Joseph James. On October 12, 1988, the trial judge denied the motion without a hearing, holding that "the evidence submitted by the defendants in support of their motion lack[ed] sufficient reliability, clarity, and strength to warrant further inquiry." After imposition of pre-Guideline sentences on October 13, and 14, 1988 ranging from six to seventy years, the defendants appealed the trial judge's order.

In its decision of January 18, 1989, the Court of Appeals vacated the trial judge's order denying a new trial and remanded the case for further proceedings before another district judge, including an evidentiary hearing "to determine whether the allegations are true and to provide a basis for assessing whether [defendants] were prejudiced by inappropriate communications with the jury". 866 F.2d at 544. The Court of Appeals stated that "[t]he substance of the inquiry on remand should be limited to determining whether the Judge or Marshal made ex parte statements to the jury, what each said, the factual circumstances surrounding any ex parte contacts, and whether the jurors who heard the statements communicated the content of those statements to the other jurors" in order to determine whether defendants are entitled to a new trial. *Id.* The Court of Appeals noted that, on remand, the investigator who submitted the cursory affidavit stating that he took the statements of three jurors, the three jurors who came forward with affidavits, and the Deputy Marshal, should be called as witnesses. Whether the rest of the jurors, as well as

the trial judge, should testify was left to the discretion of this Court.

*The Hearing*

Pursuant to the Court of Appeals Mandate that the scope of this hearing "should be limited to only what is absolutely necessary to determine the facts with precision," 866 F.2d at 544, this Court heard the testimony of the three affiant jurors, two private investigators, Raymond Glynn and Marilyn Reynolds, who solicited the statements contained in the three jurors' affidavits, three notaries public who notarized the affidavits, an attorney, Stiso, who attended a meeting with between one juror and the investigator, and the Deputy Marshal who allegedly made an ex parte statement to the jurors.

*Findings of Fact and Conclusions of Law*

Raymond P. Glynn, a New York State licensed private investigator, had retired as a Lieutenant in the New York City Police Department, having served from 1954 to 1974 both as a detective and a uniformed officer. Prior to that time he had been employed as a part-time United States Marshal and in other occupations. A distinguished looking, gray-haired man, Glynn could have come from Central Casting to play the part of a Detective–Investigator.

His connection with the trial began in 1987 and included almost daily attendance in Court, both during the trial and during jury deliberation. He testified that during the trial he had been employed by Albert A. Gaudelli, Esq., attorney for defendant Aniello Migliore. The reason for and scope of this employment is unclear. Glynn claimed that his employment by Gaudelli was concluded following the post-verdict medical hearings before Judge Lowe but that on June 1, 1988 he met with Mr. Anthony DiNapoli, brother of Vincent and Louis DiNapoli, defendants in the case, who asked Mr. Glynn to interview the jurors because he was "quite concerned at what appeared to him to be a sudden and precipitous decision on the part of the jury when they were obviously focusing in a different direction" (Tr. 12). Glynn contended that his investigative efforts were sought and thereafter supervised by Mr. DiNapoli, not by Mr. Gaudelli or any other attorney. Apparently this rather vague instruction was sufficient for Mr. Glynn, who set off to locate and interview the jurors.

There is a slight ring of untruth about this aspect of Glynn's retainer. The Court suspects that Glynn's post-trial services were sought and managed, directly or indirectly, by one or more lawyers, for it defies belief that such inquiries were the brainchild of the defendants' brother.[1] The point is of little moment except insofar as it affects Mr. Glynn's credibility adversely, in a general way.

Our Court of Appeals has stated that "complicity by counsel in a planned, systematic, broad-scale, post-trial inquisition of the jurors ... is reprehensible." *United States v. Brasco*, 516 F.2d 816, 819 n. 4 (2d Cir.1975) Although not forbidden by statute, post-trial inquiries of jurors conducted in defiance of specific court orders may constitute obstruction of justice. *Rakes v. United States*, 169 F.2d 739, 745–46 (4th Cir.1948). Nothing in the record of this case, however, suggests that counsel for defendants, assuming they directed Mr. Glynn, violated either of these principles. Glynn neither harassed unwilling jurors nor violated instructions against approaching them because no such instructions were ever given.[2] He asked questions of cooperative jurors, declining even to approach two jurors (the "upstate" jurors) from whom he expected hostile or unsympathetic responses. At the close of trial, the jurors were free to discuss the case to whatever extent they saw fit. Mr. Glynn did nothing improper by asking several of them whether they wished to do so.

---

1. The Court does not know Mr. Anthony DiNapoli but understands he is not a member of the Bar.

2. The usual direction given at the start of the trial (Trial Transcript 1199–1200) forbidding any contact with the jurors by anyone involved with the case, including the defendants and their attorneys, could not reasonably be interpreted to extend to post-verdict contact.

■ Our Court of Appeals has stated in *dicta* that "... post-trial questioning of jurors must only be conducted under the strict supervision and control of the court, with inquiry restricted to those matters found by the court as both relevant and proper." *United States v. Brasco, supra.* We believe, however, that this principle does not apply where, as here, jurors voluntarily submit to interrogation and choose to exercise their First Amendment rights to criticize the judicial system and their own participation in it—whether to counsel, the media, or a private investigator hired to impeach the verdict. The rule of *Brasco* is not supposed to disable lawyers from establishing claims of juror bribery or improper outside influence. The right to assistance of counsel does not end with the judgment of conviction. We can conceive of no reason why counsel for criminal defendants should be forced either to await the fortuity of media investigation or to file unsubstantiated motions to impeach a verdict based only on suspicion. Any rule necessitating such a choice would so limit counsel as to deny criminal defendants their Sixth Amendment right to effective representation. It would also burden the courts with meritless—and, by definition, unexamined—allegations.

■ Practical necessity often leaves counsel with little choice but to conduct a limited independent investigation to substantiate suspicion in order to justify a court-directed full investigation. Indeed, counsel may have believed that judicial supervision and authorization of their effort to impeach the jury's verdict would be inappropriate if, as here, some supposed interaction between the trial judge or the marshal and the jurors was the object of investigation. Such a view would not necessarily involve any imputation of bias or unfairness against the trial judge, for our system of limited government does not permit the President to adjudicate the lawfulness of his own actions, *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), nor the legislature to determine the constitutionality of its own enactments, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Surely the Court of Appeals did not intend in *Brasco* to make individual judges the sole investigators of their own conduct. The mandate of the Court of Appeals in this case rests on the assumption that such allegations are best investigated by an independent, unbiased fact-finder. It is our view, therefore, that once their suspicions were activated, defendants' lawyers were entitled to conduct such inquiries of the jurors as were necessary to establish a colorable claim. That the investigators in this case did so with deference to the privacy rights of individual jurors, as they did, reinforces our belief that such inquiries need not open the door to intrusive post-trial investigations.

Thus, even assuming that Glynn's investigation was coordinated by some knowledgeable lawyer acting for one or more of the defendants—an obvious conclusion on this record—no wrongdoing or ethical breach was involved.

Glynn claims that the investigation was prompted by a perceived suddenness of the jury's verdict. On May 2, 1988 the jurors sent out an ambiguous note calling for a series of tapes by subject matter. At least five hours were wasted while the attorneys bickered with each other and argued with the trial judge over which tapes were required to be re-played in response to the note. Thereafter, some tapes were replayed, but the jurors decided that they did not want to review additional tapes. According to Glynn: "A short time thereafter, they came out with a verdict and [Anthony DiNapoli] thought this was—it just wasn't consistent." Glynn describes his retainer as being "to interview some of the jurors to determine what their feelings were along this—these lines." (Tr. p. 12). In fact, the verdict was rendered on May 4, 1988, two days after the jury decided it did not wish to re-hear the additional tapes.

Beginning on July 5, 1988, Mr. Glynn employed Mrs. Marilyn Reynolds and associated her with the investigation. Mrs. Reynolds, also a retired New York City police officer, is an articulate and experienced investigator who also could have been drawn from Central Casting. Mrs. Reynolds understood that her assignment

was to help the defense lawyers who were working on the appeal of the verdicts. Her admitted function, which she performed most effectively, was to play a duet with Glynn in the course of interviews and to establish a good relationship with the affiant jurors. *See* Exhibit 303A at 6. This form of police interrogation, which is quite common, is often described as the "good cop, bad cop routine," but in this case it was more the "smart cop, dumb cop," with Mrs. Reynolds cast in the first position and Glynn pretending to require considerable repetition and explication of the witnesses' statements before he would admit that he could understand them.

The jury in this case was described as "semi-anonymous". There is, of course, no such thing as a semi-anonymous jury in a long trial. Apparently, the jurors were permitted to give only their last names, and tell the general neighborhood or vicinity in which they lived, as well as their occupations. Since all jurors, with exceptions not material, of necessity had to come from Manhattan, the Bronx, or a point upstate within fifty (50) miles of the Foley Square Courthouse, locating such jurors could not have been a difficult problem for a trained investigator. Mr. Glynn contends that he used ordinary procedures, such as the Motor Vehicle Department checks, the telephone book, and reference to the Board of Elections. It is more likely that Joyce Domingo, the foreperson of the jury and an early, enthusiastic participant in this plan to impeach the verdict, who admits she knows the full names and residence addresses of all, or almost all, of the jurors, provided the information needed to locate them.

Glynn says he found out that the jury foreperson, Joyce Domingo, lived in the Bronx, and managed to obtain her home telephone number in spite of the fact that the phone listing was under the name "Gibson". Mr. Glynn testified that he called and identified himself, told Ms. Domingo that he was interviewing jurors in the *Salerno* case, and asked her if she would meet with him to discuss the case. They arranged to meet at a nearby Burger King restaurant on June 13, 1988. (Tr. 18–20)

Ms. Domingo emerges as the most important figure in this proceeding, and this Court is compelled carefully to scrutinize her testimony, which presents the only evidence of prejudicial ex parte juror contact.

According to Glynn, Ms. Domingo began the restaurant conversation, which conversation was not tape-recorded, by saying that she was "sorry the way the verdict turned out" and "that deliberations began with a vote of 9 to 3 for acquittal, because they felt that there was not enough evidence shown to convict these people" (Tr. 21). According to Glynn, Ms. Domingo, told him the following during that first meeting:

(1) She was told by someone on the outside that if they didn't come to a decision they would have to listen again to 100 of the tapes;

(2) On another occasion, the Judge had come to the deliberation room door and had said to them that she did not want a hung jury, either convict or acquit, but she did not want a hung jury; and

(3) During the forfeiture proceedings, after the initial guilty verdict had been announced, she had entered the Judge's Chambers to call home, the Judge had asked her how she was doing, and when she responded that they "were having big arguments and it looked like they were not going to be able to come to some decision", the Judge then told her to go back in and to try to pull the others together "because I don't—I do not want a hung jury" (Tr. 22).

Glynn claims that he tried to tape record this meeting, but his only recorder was broken. (Tr. 26). His "scratch notes" of the interview were not produced.

Mr. Glynn took Ms. Domingo for lunch again on June 16, 1988 at the same Burger King restaurant and asked her if she would sign an affidavit. She said she would. He prepared a two page affidavit and returned to the Burger King the following day at noon with a Notary, attorney Pat V. Stiso. Ms. Domingo said that she wanted to take the affidavit home to review before signing it, and he left the proposed affidavit with

her. On Monday, June 20th, they met again by prearrangement. Ms. Domingo had re-drafted the second page of the affidavit on a typewriter at her place of employment. Glynn then took Ms. Domingo to the office of well-known criminal defense attorney Murray Richman, Esq., at 2027 Williamsbridge Road in the Bronx, where Mr. Stiso was employed and where he knew a Notary Public would be available. Although Stiso was present, the Notary used was Denise Begasse. Testimony of the Notary Public, Denise Begasse (Tr. 272) was essentially consistent with that of Glynn concerning the signing of the Domingo affidavit. The first page was initialed by Ms. Domingo at the Notary's request. Attorney Stiso also testified that he had been present at the diner on the earlier occasion when the affidavit would have been signed had it been acceptable to Ms. Domingo (see Tr. 282).

The Domingo affidavit is Exhibit "1" at the Hearing. The claim about the Judge appearing at the doorway and telling them that "they must work together and come to some decision ... [e]ither a conviction or an acquittal, but she did not want a hung jury" appears on the first page of the Exhibit originally typed by Mr. Glynn, followed by the conclusion of Ms. Domingo that "all the Jurors heard the Judge's remarks." Reference to the second alleged contact with the Judge, when Ms. Domingo made a telephone call from the judge's room, is also found on the first page.

■ The second re-typed page contains nothing of specific relevance to this Hearing. However, it does tell us that Ms. Domingo, at least in June of 1988, was most displeased with the jury verdict, regarded the Judge as "a very nice lady [who] seemed to lean more toward the Government", and claimed that in the forfeiture proceeding there had been "trading off" among the Jurors in order to reach an agreement that "Tony" (Mr. Salerno) could keep his farm. She also offered the conjecture that she was "sure some of [the jurors] [had] read the [news] papers." These two latter assertions are of no relevance except that they bear on the witness' state of mind. They are not within the scope of the remand and are barred by Rule 606(b) F.R.Evid.

This Court has examined the original, unsigned page two of the affidavit as drafted by Mr. Glynn. The differences between the respective second pages are very slight. For example, Ms. Domingo corrected the name of the judge's clerk, typed by Glynn as "Lily" to read "Lisa". The sentence referring to the Salerno farm had originally been drafted by Mr. Glynn as reading "Ms. Domingo said they got Tony [Anthony Salerno] and Maishe [Milton Rockman] out of the Teamster thing, only by swapping or trading off". References to Senate Sub-Committee Hearings and Vincent Coffaro were eliminated in the re-draft. All these changes are essentially insignificant. After signing the affidavit, Ms. Domingo asked Mr. Glynn for a copy of it. He took the original and left the Richman law office. Mr. Glynn's June 20th and July 19th meetings with Ms. Domingo were tape recorded. Meetings on June 13th, 16th and June 17th were not recorded. The excuse given is that the tape recorder was broken. No inference adverse to the movants or the witnesses can be drawn from the fact that some meetings were recorded, and some were not. All law enforcement agencies make selective use of specific methods of investigation, including concealed tape recorders. However, the claim that the tape recorder was "broken" and no substitute machine was available has a slight ring of untruth to it.

Ms. Domingo testified before me on April 14, 1989. Her demeanor and attitude could fairly be described as highly favorable to the movants. Ms. Domingo testified that she was strongly in favor of acquitting the defendants and was happy to assist Mr. Glynn in any way she could to see that the defendants received a new trial (Tr. 403). Nevertheless, on her direct examination, she was somewhat less certain of the critical facts than her affidavit and prior conversations, as reported by Glynn, would suggest. In response to a leading question, she described the trial judge, at a date or time which she could not remem-

ber, as having come to the jury room door. She testified:

(Direct examination by Mr. Jacobs (Tr. 303)

Q. Did there come a time during the jury deliberations in that case that Judge Lowe appeared in the doorway of the Jury Room?

A. Yes, she did.

Q. Do you recall anything that she said, if anything?

THE COURT: First fix the time.

Q. Do you remember when that was, Miss Domingo?

A. I really can't say. It's been so long ago.

Q. Can you tell us what was said, if anything.

A. For us to carry on and come to a decision. Probably during lunch break. That's the only time the door would have been open.

Q. Do you remember her exact words?

A. Come to a decision. Carry on.

The witness also testified (Tr. 304) that at a later time the Judge said that she did not want a hung Jury: "She said to pull the others together, so we can come to a decision and we can't [sic] have twelve yes and twelve no. Just come to a decision." This event is described as having happened on a "night we worked very late, till 1:00, 2:00 o'clock in the morning". Ms. Domingo was in the Judge's robing room to make a telephone call "and she asked how everything was going, and I told her not good" (Tr. 305). The telephone call was placed while the Jury was engaged in deliberation on the issue of forfeiture, and I find that it is the same contact described in Judge Lowe's affidavit as the "we want pillows and blankets" situation, discussed below.

Movants then confronted Ms. Domingo with her own affidavit obtained by Mr. Glynn. The following testimony ensued:

(By Mr. Jacobs: Tr. 305)

Q. Ms. Domingo, let me take you back to the first time that you said the judge was at the jury room door. Do you remember anything else that the judge said at that time?

A. No, just to carry on and come to a decision.

Q. Let me show you court Exhibit No. 1, Ms. Domingo, and ask you whether you have seen that document.

A. Yes, I have.

Q. And what is it, ma'am?

A. Well, it's a deposition of what I remember.

Q. Would you look at it—would you take a moment and read it, please?

A. Starting with the date?

Q. No, read it to yourself.

(Pause)

Q. Have you read the document?

A. Yes, I have.

Q. Is that your signature that appears on page 2 of the document?

A. Yes, it is.

Q. After reading [that] document, do you recall anything else the judge said when she was at the doorway to the jury room, if anything?

A. Just what's in here, in the paragraph.

Q. Not what's in the paragraph. What do you recall as you sit here now that she said, the exact words?

A. That we had to come to some decision, she didn't want a hung jury.

Q. And after that statement was made by the judge, was that statement either acknowledged by any of the other jurors, to your knowledge, ma'am?

A. *No. I don't think they thought anything of it.*

Q. I am sorry?

A. *No, I didn't think so.*

Q. Was it discussed among the jury, that statement by the judge?

A. *Oh, yes, it was.*

(Emphasis added)

Ms. Domingo also testified on direct examination (Tr. 309) that "a United States Marshal" said "the people outside are getting tired and restless, and if we don't hurry up and make some type of decision, we are going to have to listen to over 100 audio tapes". She said she had this conversation with the [deputy] United States Marshal between the door and the hallway and

thereafter communicated the substance of that conversation to the rest of the Jurors.

Joyce Domingo played a pivotal role in the defendants' motion for a new trial. One would think that the jurors, having finished a long trial, would be extremely reluctant to involve themselves in a rehash of events with a virtual stranger. In fact, this was the reaction of most of the jurors contacted by Mr. Glynn and Mrs. Reynolds. Ms. Domingo, however, embraced the defendants' cause. Not only did she revise and sign her own affidavit, with some effort, to support the new trial motion, but she also provided critical assistance in locating the other jurors for Mr. Glynn and gathering sworn statements from them. Without her intervention, both juror Helen Talley and juror Joseph James most likely would not have allowed Mr. Glynn and Mrs. Reynolds to interview them. Ms. Domingo interceded to obtain agreement by Mrs. Talley to communicate with Mr. Glynn after she had refused to do so and was physically present when Ms. Talley signed her affidavit in support of the motion before Notary Joseph Pollock in a "very small travel agency" on Tremont Avenue.[3] Ms. Domingo engaged, at Glynn's request, to deliver the affidavit to Helen Talley for signature (Tr. 354), although she denied, implausibly, on cross-examination that she had any discussion whatsoever about the statement with Ms. Talley when she delivered it for signature. (Tr. 359)

According to Ms. Domingo, when she was first contacted by Mr. Glynn at home she arranged to meet with him without any hesitation (Tr. 321, 324). She was not surprised by the call and had no suspicions or curiosity about Mr. Glynn; she never asked him any questions about whom he represented or why he might be calling her. He said that he wanted her opinion about the case, and as noted earlier, she responded that "[s]he would try to help because [the defendants] got a rotten deal, whatever I could do or say or whatever" (Tr. 403).

Ms. Domingo further testified that "throughout the deliberations" other jurors

acknowledged that they had heard Judge Lowe's statement (Tr. 307). She insisted that "every juror heard the statement. I feel they all heard it. Now what they say is a different story. I know they all heard it" (Tr. 369). This statement is flatly contradicted by testimony of the other two affiant jurors and by Glynn's taped interviews with four other jurors who did not testify. Ms. Domingo could offer no explanation as to why *none* of the other jurors recalled the event (Tr. 369).

Concerning the alleged Marshal incident, Ms. Domingo presented the only evidence at the hearing that supports movants' position. Ms. Domingo testified that near the end of first phase deliberations, right after the jury had sent out a note asking for tapes, she met the Marshal alone in the hallway outside the jury room. This is inconsistent with Joseph James' testimony below that the Marshal came into the jury room and spoke so that all the jurors could hear. Ms. Domingo further testified that she "conveyed [the Marshal's statement] to the rest of the jury[,]" saying "I have an announcement to make, and they all heard" (Tr. 373–77). Again, none of the other jurors recalled such a remark by Ms. Domingo.

The contact with the Marshal allegedly occurred when the jurors had to go back into the jury room to pinpoint particular tapes that they still wanted to replay and had requested earlier in the day (Tr. 373). The jury had listened to approximately 4 tapes out of 25 in response to note 31 (as modified by note 34) and then had requested to return to the jury room (Trial Tr. 24,407). They later sent out note 35 saying that they did not wish to listen to the remaining tapes. Accordingly, the Marshal was authorized on the record by the trial judge to ask the jurors if they still wanted a different request (note 32) fulfilled concerning tape 429. Marshal John J. Perrine, on the trial record, stated that he spoke to "the forelady, and she replied that they did not want to hear that tape, that they are

**3.** Neither Mr. Glynn nor Mrs. Reynolds were present. Notary Pollock did not remember the incident but testified that he only worked in the travel agency in the evening and on Saturday.

deliberating and did not need it" (Trial Tr. 24,408).

On cross-examination at the hearing held by this Court, Marshal Perrine was asked "do you recall in words or substance telling Joyce [Domingo] that if they didn't come to some decision, they would have to—as to which tapes they wanted to hear—they would have to listen to over a hundred tapes?" (Tr. 479). The answer was unequivocal. Marshal Perrine earnestly stated: "I don't recall a conversation because I would not have made that kind of a comment. That is an opinion comment, and I would not make a comment like that.... I would never speculate or put in any kind of statements to the jury" (Tr. 485–86). This Court finds Deputy Perrine to be a credible witness, free from guile and lacking any motive to lie.

While proof of a motive is not necessary to support a conclusion of wrongdoing, the absence of motive can be significant in determining whether wrongdoing occurred. A Deputy Marshal who violates his oath while having custody of jurors risks severe punishment, including discharge from his employment.[4] Extended jury deliberations are not detrimental to a deputy: the service is safe, pleasant and relatively easy, with good food and an opportunity to earn compensatory time off. A bored deputy can easily request reassignment, since jury custody is a sought-after duty. A jury deadlock is likely to result in a retrial with more opportunity to do the same. Perrine had nothing to gain and a whole lot to lose by any attempt to hasten deliberations or coerce a verdict.

Ms. Domingo claimed that she did not know that the Judge had sent the Marshal in to the jury room, with the approval and authorization of all attorneys, to ask them questions about the tapes in an effort to discern to which notes the jury then wanted the Court to respond (Tr. 382). When Ms. Domingo was reminded that the jury had complete control over which evidence it

wanted to listen to, had a list of tapes by subject matter in the jury room during the course of deliberations, and had asked for specific tapes to be replayed and requested others by exhibit number and subject area until they got what they wanted, she conceded: "[I]t was the jury who made that decision not anybody else" (Tr. 379–80). Apparently, at the very least she is confused as to the time, place, source and content of the communication with the Marshal, which was authorized by the Court and not clandestine.

Concerning the third alleged ex parte contact, Ms. Domingo testified that during forfeiture deliberations, on the night they worked until 1 or 2 A.M., Judge Lowe said "she didn't want a hung jury. She said to pull the others together ... [j]ust come to a decision" (Tr. 304). Ms. Domingo stated that the conversation took place in the Judge's chambers when she went to make a telephone call and that after she had this conversation with Judge Lowe, she went back to the jury room and communicated the conversation to other members of the jury (Tr. 309, 388). Ms. Domingo further testified that, earlier that evening, the jury had sent out a note asking whether they could have a hung jury on two specific charges. The jurors were then brought into the courtroom and given a modified *Allen* charge. (Trial Tr. 25005, 25008–25011). This charge instructed the jurors that they must "under no circumstances" yield their own "conscientious judgment" in order to reach a verdict and, at least by necessary implication, that they could deadlock. Such formal instruction in open court likely would receive greater deference from jurors than some casual informal contact with one juror.

After the *Allen* charge, the jury resumed deliberations at 8:50 P.M. and continued until 12:01 a.m., when it rendered a partial verdict on the forfeitures. The jury was excused at 12:50 A.M. Twelve hours later,

**4.** The oath regularly administered to deputy marshals at the deliberation stage of a criminal trial reads: "You (and each of you) do solemnly swear that you will keep the jurors empaneled and sworn in this cause, together in some private and convenient place. You shall suffer no one to speak to them nor shall you speak to them yourself without direction of this court unless it be to ask them if they have agreed upon a verdict. So help you God".

at 1:00 P.M., the jury resumed deliberations and continued until 3:30 P.M., when it reached a final verdict on the forfeitures.

*Helen Talley*

 The next affiant juror contacted by Mr. Glynn was Mrs. Helen Talley. They met on August 1, 1988 at her home. Mrs. Reynolds was also present at this interview, which was tape recorded. Although Ms. Domingo testified before me that she did not remember Mr. Glynn asking her to get in touch with Mrs. Talley to see if she could get her to speak to him, one of the taped conversations between Mr. Glynn and Ms. Domingo (Court Exh. 15) clearly shows that at Mr. Glynn's suggestion, Ms. Domingo agreed to use her influence with Helen Talley. Ms. Domingo said that when she called Mrs. Talley on the phone, she told her that Mr. Glynn had asked her "if there was anyone else in the jury that, you know, heard ... and I says I feel that there are other people, and Mrs. Talley said 'if she could do anything to help, she would help'" (Tr. 314).

Mrs. Talley had a slightly different version of this conversation. She admitted that earlier she refused to speak with Glynn. Mrs. Talley urged Glynn to "bring back one of the lawyers, and maybe I will consider talking to you". Glynn denied, on his direct testimony, that he knew how the contact was made, but he did go back to Talley's apartment on August 1st. We know from the testimony of Mrs. Talley that it was because of Domingo's blandishments that Talley consented to meet with Glynn and Reynolds. She said that Ms. Domingo "asked me would I talk to Mr. Glynn ... she said she talked to him" (Tr. 418).

The statement of Helen Talley, composed by Mr. Glynn and consisting of three pages, was sworn to on August 4, 1988. Mrs. Talley was a pro-defendant juror who, in her earlier years, had lived in Harlem and had enjoyed friendly and beneficial relations with a so-called "crew", the members of which were unrelated to the Genovese family but engaged in organized crime. It is apparently conceded that this prior relationship was not disclosed by Mrs.

Talley in the course of the Jury selection process.

Mrs. Talley's affidavit describes herself during deliberations: "I was fighting tooth and nail for these men" and as believing that "these men should have been tried separately, or in small groups", and that "to get the big fish, they suck in all the little fish". She says that she "went in there to fight for them so they wouldn't all just be caught up, because they really had no evidence to convict these men". Mrs. Talley's affidavit says that "from the beginning she got the impression from the Judge that it had to be twelve "yes", or twelve "no". She said she was only speaking for herself, but that is the way she felt the Judge wanted it. "The Judge did not want a split decision, it had to be yes or no." Her affidavit says she recalls the judge coming to the jury room door once, maybe twice, inquiring as to how they were doing; it states that "Mrs. Talley remembers the Judge once coming to the door and reminding them to either convict or acquit, but she did not want a hung Jury".

The best reflection of the investigators' interview with Mrs. Talley is found in Exhibit 203(a). That is the tape recording of the actual interview and the source from which Mr. Glynn prepared the Talley affidavit. The interview does not support the conclusions set forth in the affidavit. At one point, on page 16 of the transcript of the taped interview of August 1, 1988, the following appears:

Glynn: But then, then, the only influence the Judge tried to put upon you is that you had to try to come up with a decision.

Talley: Yea, we were, she wanted a decision, at to me, that's what I thought it was. She wanted us to say, to say, yes or no.

Reynolds: Did she ever remind you of that during the deliberations, during the time of deliberations.

Talley: *No.* Just that one time when she read her. Gave her time on the bench.

Reynolds: Yeah.

Talley: Yeah, and that was it.

Reynolds: When she instructed the Jury.

Talley: That's it.

(Emphasis added)

Prodded by Glynn, Talley denied on the tape that Judge Lowe made the alleged statement through the door (Page "17").

Glynn: Ah, one of the Jurors told us that she would stop by and inquire how you were doing, and ...

Talley: Ah, sometimes, ah, at early in the morning, like before we, before we, ah, settled down. You know, ah, how are you doing, you know. But, that was before

Glynn: Umhum

Talley: Ah, during the, ah, deliberations.

Glynn: You mean that was while trial was going on you say.

Talley: Umhum.

Reynolds: I see.

Glynn: You see a couple of the Jurors told us that like a, she came about three times. Oh, this one Juror was really, oh, you know, recalled. The other Juror said that she happened, you know, look in the door, how was everything going, and she ...

Reynolds: Yeah.

Talley: Like I said, maybe once or twice, but you know. It wasn't, ah, for the most time she was in that room over there.

Reynolds: Yeah.

Again, later in the interview at Page 37 of the transcript, Talley describes Judge Lowe:

Talley: The only time I would really see her was when she comes in the morning. You know.

Glynn: Umhum.

Talley: And, ah, after we all get in, then we would sit down and close the door. And then, ah, whatever, ah, agent is outside, he, ah, he gives us our books and pencils, or whatever situation. Or, if we needed anything they would be willing to pick it up, or something like that, you know, but normally she [the Judge] she, ah, usually would be in before we really sit down and really start ...

Glynn: Yeah.

Talley: Trying to iron out our differences. And she would say "Good Morning" or speak to us, or you know how that, you know, and then she goes on to that other side over there.

Glynn: When she told Joyce [Domingo] ah, about trying to get everybody together.

Talley: Umhum.

Glynn: Did Joyce come back in and tell you people that. Did she tell the whole Jury, or what? Do you remember that.

Talley: I don't know. And, ah, I can't remember. (UI) I don't know.

Treating the transcript of Mrs. Talley's initial interview as being the best evidence of her true knowledge and recollection nearest the events in point of time, it does not support movants nor does it corroborate Ms. Domingo's claims. Although Mrs. Talley is very partial to the defendant/movants, the totality of her testimony is of little assistance to them. According to Mr. Glynn, Mrs. Talley recalled the trial judge "coming to the deliberation room door once and maybe twice" at which time the Judge warned that she "did not want a hung jury ... it had to be guilty or not guilty" (Tr. 65–66). Glynn's testimony to this effect is contradicted by his own tape and by Mrs. Reynolds. Moreover, Mr. Glynn testified that Mrs. Talley had told him that when Ms. Domingo went to make a phone call in chambers, she came back and told the others that the Judge had said that they must reach some decision.

At the hearing, on direct examination, Mrs. Talley testified that Judge Lowe came to the door at lunchtime and asked how everything was going (Tr. 407). When informed that the jurors were struggling, Mrs. Talley testified that Judge Lowe told them "to try a little harder ... because we have been at it too long and we don't want a hung jury" (Tr. 407). Mrs. Talley then added that the jurors had discussed the Judge's instruction (Tr. 408).

Mrs. Reynolds testified, however, that she remembers Mrs. Talley saying during the August 1st interview, when her memory was fresh, that she didn't recall the

Judge coming to the door and giving them an instruction to acquit or convict (Tr. 295–96). This is confirmed by the tape-recorded conversation among Glynn, Reynolds, and Talley in which Mrs. Talley repeatedly denied hearing such an instruction from the Judge at any time except when the jury was being charged. Time and time again, Mr. Glynn asked if the Judge had influenced the jury in any way, and she answered No (Tr. 504). Finally, Mrs. Talley testified that the jury had understood from the very beginning that it had to be twelve yes or twelve no, because that was the instruction contained in the Judge's charge, and that the only time this instruction had been given was from the bench (Tr. 511).

With respect to the alleged Marshal incident, Mrs. Talley testified on direct examination that Ms. Domingo had told the other jurors that "John" (John J. Perrine, the Deputy Marshal) had said that the jurors would have to listen to over 500 tapes if they did not come to a decision.[5] This incident is not mentioned in Mrs. Talley's affidavit, and during the interview with Mr. Glynn in which he repeatedly questioned her on this subject, she denied ever hearing a Marshal say anything to that effect (Tr. 491). Mrs. Reynolds testified, confirmed by the tape, that on leaving Mrs. Talley Mr. Glynn "told Mrs. Talley to try and remember the events that he claimed the other jurors had told him".

When asked if Mr. Glynn prepared the affidavit (Ex. 4) for her, Mrs. Talley said no.[6] She further explained that Mr. Glynn never asked her if she would sign an affidavit, but that Ms. Domingo called her after the meeting with Glynn on August 1st and "said she was bringing over some papers for me to sign pertaining to what I had said, talked to—with Mr. Glynn" (Tr. 421). Ms. Domingo in fact proceeded to do more favors for Mr. Glynn and defendants by obtaining the statement prepared for

Mrs. Talley from Mr. Glynn, delivering it to Talley, driving her to a notary, and then returning the notarized document to Glynn (Tr. 355–56).

The affidavit of Mrs. Talley is inconsistent with her testimony and her taped interview. Her execution of the affidavit was procured by Ms. Domingo, under circumstances highly suggestive of fraud and collusion. To the extent they differ from her taped interview, her affidavit and testimony are incredible and entitled to no weight.

*Joseph James*

The third and last affiant juror Mr. Glynn successfully contacted was Mr. Joseph James, who met with Mr. Glynn and Mrs. Reynolds at least four times and then prepared a hand-written affidavit supposedly on his own initiative in which he described contacts by the Judge and the Marshal. Again, there is conflicting testimony concerning the preparation of the affidavit. Mrs. Reynolds testified that Mr. James had a completed two-page handwritten document with him when he met with them in Mr. Glynn's car on July 29, 1988, which he gave to Glynn for his review. This conflicts with Mr. Glynn's testimony that Mr. James prepared the affidavit in their presence in the car.[7]

Mr. James, Ms. Domingo and Mr. Glynn all testified that no one made any suggestions as to what the statement should contain. However, Ms. Domingo did say that she had "one or two conversations" with Joseph James in June or July after she had met with Mr. Glynn several times (Tr. 345), and Mr. James knew before he made his statement that Ms. Domingo had made a similar statement.[8]

On cross-examination, Mr. James admitted that the trial judge told the jurors in her instructions from the bench that they had to reach a unanimous verdict (Tr. 598).

5. Somehow, one hundred tapes became five hundred tapes.

6. Glynn admits he prepared Exhibit 4. (Tr. 69)

7. Here again, the tape recorder was not working, supposedly because Mr. Glynn did not have time enough to turn it on.

8. Curiously, Ms. Domingo had no contact with either Mrs. Talley or Mr. James, supposedly her friends, once they had signed their affidavits for Mr. Glynn. (Tr. 400)

On redirect, the following exchange took place:

Q. Do you recall Judge Lowe ever speaking about not having a hung jury in the case, Mr. James?

A. No.

Q. The statement that you put in your affidavit that there was an understanding that you couldn't have a hung jury, where did that come from, sir?

A. I believe it came from Miss Domingo.

(Tr. 612).

Mr. James further testified that the idea that they would have to listen to over 100 tapes came from Joyce Domingo (Tr. 552, 578) and that there was no interference from the Marshals or anyone else during the course of deliberations (Tr. 590).

Mr. James testimony at the hearing does not support the position of the movants. James, who had completed three years of college, was employed as a motorman in the New York City subway system. He was generally hostile to the court and the criminal justice process, highly favorable to the defendants in his attitude and state of mind, as well as friendly to Ms. Domingo. However, his testimony, read in its totality, does not support the claims here, even without any consideration of possible bias on his part against the Government and without considering any issues as to his credibility.

*Other Jurors*

Mr. Glynn also attempted, with the help of Mrs. Reynolds, to contact some of the other jurors. No effort was made to contact the two so-called "up-state jurors" because "they wouldn't help [the] cause anyway" (Court Exh. 13). Three jurors, Jenkins, Shine and Wigfall, refused to be interviewed. Four in addition to the three affiant jurors, submitted to interviews which were secretly tape recorded. Jurors Ethel Stallworth, William Herbert, Clementine Jones, and Joseph Hladki all stated in their tape-recorded conversations with Mr. Glynn, discussed *infra*, that the only time that Judge Lowe said "come in with a verdict of guilty or not guilty" was in speaking from the bench in the courtroom.

The fundamental contradictions in Joyce Domingo's own testimony, inconsistencies between her testimony and her affidavit, and the contradictions between her rendition of the facts and those of the other jurors interviewed, all make clear to the Court that she cannot be considered a credible witness. Although at the hearing, after prodding, Ms. Domingo affirmed the substance of her original affidavit, her obvious predisposition towards the movants and pervasive second thoughts about her verdicts cast serious doubt upon the truthfulness of that part of her testimony. Whatever her motives, her testimony must be discounted for want of credibility and because it is confused, uncorroborated, rife with internal inconsistencies, and contradicted by so much other evidence in the case.

*Response from the Trial Judge*

Following the Court of Appeals' suggestion that "[p]erhaps Judge Lowe's account of the facts may be adequately set forth in an affidavit," *Ianniello*, 866 F.2d at 544, this Court wrote a letter to Judge Lowe on August 14, 1989 with copies to all counsel. That letter advised in relevant part:

"In order that I may have a jurisprudential basis upon which to exercise this "broad discretion" referred to in the Court of Appeals opinion, I respectfully request that you read and consider the testimony heretofore taken in this matter.

If your testimony would be merely cumulative, no purpose would be served by submitting anything. If you have material evidence which bears on the issue, I would appreciate learning this from you, together also with such suggestion as you may have as to whether you wish to proceed by affidavit, and if so, when this can be accomplished.

Thereafter, by affidavit dated August 21, 1989, Judge Lowe testified as follows:

In the course of over seventeen years sitting as a judge, I have no recollection of ever having told a jury that it must either convict or acquit or that there could not be a hung jury. Indeed over

the years, I have presided over a number of trials which resulted in a hung jury. To tell a jury to acquit or convict or that there could not be a hung jury would be contrary to my entire experience as a judge, *and I have no recollection of doing so in this case.*

*See* Affidavit of the Honorable Mary Johnson Lowe at 4–5 (emphasis added).

Judge Lowe's affidavit also mentions a time during deliberations when, with the consent of counsel, Judge Lowe had dealt with the problem of a juror who required medical attention.[9] She states that in passing by the jury room when the door was open, she said to the juror "Are you feeling better?" and the juror responded in the affirmative and thanked the Judge. Assuming that by understanding of counsel these dealings with jurors' personal problems were not required to be spread on the trial record, that fact was not necessarily known to Joyce Domingo. If the claimed ex parte contacts by the Judge stood out so in her memory, one would have expected that she would also have informed Mr. Glynn and this Court of the incident of the Judge speaking with ill juror number six or seven, as the case may be. Domingo never mentioned it.

Judge Lowe's affidavit does recall a note from the jury asking for pillows and blankets, reiterated in person by Joyce Domingo when using the Judge's telephone. She states that she did tell Domingo that "there will be no pillows and blankets—either the jury deliberates or they will be sent home". Interestingly enough, no mention of the pillows and blankets has been brought forward by any of the affiant jurors.[10]

▆▆▆▆ In letters and briefs to this Court, movants argue that Judge Lowe should be required to give oral testimony and submit to cross-examination. Although our Court of Appeals has acknowledged that "asking a district judge to testify is a serious matter", *Ianniello,* 866 F.2d at 544; movants insist that Judge Lowe is an essential witness who must be required to give oral testimony. While recognizing that judges are not immune from subpoenas for truly essential oral testimony, the Court declines, for the reasons set forth below, to require her testimony in this case.

Movants have failed to present credible evidence sufficient to rebut the presumption of regularity to which judicial proceedings are entitled. As the Supreme Court explained some fifty years ago, "[judges] are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1940).[11] Oral examination of a judicial or quasi-judicial officer as to matters within the scope of his adjudicative duties should be permitted only upon a strong showing of bad faith or improper behavior. *See e.g. Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *KFC National Manufacturing Corp. v. NLRB,* 497 F.2d 298 (2d Cir.1974). "Should a judge be vulnerable to subpoena as to the basis of every action taken by him, the judiciary would be open to 'frivolous attacks upon its dignity and integrity, and ... interruption of its ordinary and proper functioning.'" *United States v. Dowdy Co.,* 440 F.Supp. 894, 896 (W.D.Va.1977), *quoting United States v. Valenti,* 120 F.Supp. 80, (D.N.J. 1954).

---

9. Counsel now dispute that they gave such consent. *See* Letter of Judd Burstein, Esq. docketed January 12, 1990. This issue is beyond the scope of the mandate under which these hearings were conducted.

10. The deliberations were conducted allowing the jurors to select their own time for concluding the work of a particular day. In any event, the pillows and blankets incident relates solely to the forfeiture deliberations.

11. *United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1940), involved the issue of whether a district court had erred by compelling the testimony of the Secretary of Agriculture. In reaching its decision, however, the Supreme Court compared the proceeding before the Secretary with one before a judge, concluding that any examination into the mental processes of a judge would be destructive of judicial responsibility. *Id.* at 422, 61 S.Ct. at 1004.

Not only does the credible evidence in this case fail to show that any of the alleged ex parte statements were made, but it also fails to show that such remarks, if made, tainted the verdict, or even that they were conveyed to other members of the jury. Although Ms. Domingo claims that the trial judge's alleged statements either were made in the presence of the entire jury or were passed along in words or substance to the remaining jurors, Mrs. Talley and Mr. James recall events quite differently. Like Domingo, Talley and James apparently labored under the impression that Judge Lowe did not want a hung jury. Unlike Domingo, however, Talley admits that she may have derived this impression solely from listening to Judge Lowe's on-the-record jury instructions. James' testimony is so imprecise as to support no conclusion.

■ That Judge Lowe may have wanted the jury to reach a verdict, and that several jurors may have sensed her view on the subject, does not constitute evidence of irregularity or substantial prejudice in the deliberative process. After investing more than thirteen months in the trial of a case, these jurors must have appreciated without being told that substantial public resources are wasted whenever a lengthy trial ends in a jury deadlock. Indeed, their own time and effort are the most valuable of those squandered resources. Perhaps such incentive to reach a verdict is one of the unstated concerns behind recent misgivings about the propriety of mega-trials. *See e.g. United States v. Cassamento*, 887 F.2d 1141, 1149–53 (2d Cir.1989). Some versions of the *Allen* charge—especially when given in an already tense atmosphere—may well produce unanimity only at the cost of reflection and sincere belief. But these are questions for another day and another forum. Our mandate does not extend to whether the jurors in this case succumbed to any of the pressures presumably associated with lengthy proceedings, or why the trial and the deliberations took so long.

The totality of the evidence even without considering Judge Lowe's affidavit does not convince this Court that movants have sustained a claim to a new trial. Defendants have produced no credible evidence of ex parte contact, and such evidence as they may have fails to establish conduct of which the remaining jurors were aware. Thus insofar as concerns both the alleged statements and "whether the juror[s] who heard the [alleged] statements communicated the content of those statements to the other jurors," *Ianniello*, 866 F.2d at 544, this Court finds the movants have a failure of proof. The Court concludes that the oral testimony of Judge Lowe should not be required simply because it would be cumulative and unnecessary.

■ Defendants seem not to contend that Judge Lowe's oral testimony would contradict her affidavit. Rather, defendants seem to argue that they are entitled to conduct cross-examination simply for its own sake and to show, if possible, that her recollection is faulty. Judge Lowe's affidavit is plain, and there is no practical reason to believe that calling her as a witness would increase her recollection of this lengthy and undoubtedly burdensome trial concluded almost two years ago. Moreover, calling the Judge as a witness solely to assess her credibility would be pointless because the burden of proof of an element of a claim or defense cannot be satisfied by calling a witness who testifies to the contrary of the fact sought to be proved, and then arguing that by demeanor the witness is implausible or incredible. *Cf. Dyer v. MacDougall*, 201 F.2d 265 (2d Cir.1952) (L. Hand, J.)

■ Article III judges enjoy no absolute express constitutional immunity from giving testimony. There must be, however, an implied Constitutional protection to prevent collateral attack on a judgment from interfering with, burdening, or otherwise harassing the trial judge with witness subpoenas. An Article III judge has the implied freedom to do the work of the office without threat of interference. In *United States v. Nixon*, 418 U.S. 683, 705 n. 16, 94 S.Ct. 3090, 3106 n. 16, 41 L.Ed.2d 1039 (1974), the Supreme Court held:

The Special Prosecutor argues that there is no provision in the Constitution for Presidential privilege as to the President's communications corresponding to the privilege of Members of Congress under the Speech or Debate Clause. But the silence of the Constitution on this score is not dispositive. "The rule of constitutional interpretation announced in *McCulloch v. Maryland*, [17 U.S.] 4 Wheat. 316, [4 L.Ed. 579], that that which was reasonably appropriate and relevant to the exercise of a granted power was to be considered as accompanying the grant, has been so universally applied that it suffices merely to state it." *Marshall v. Gordon*, 243 US 521, 537 [37 S.Ct. 448, 451, 61 L.Ed. 881] (1917).

As a mirror principle to the rule enunciated in *United States v. Nixon, supra,* can the law be different with respect to a federal judge?

Apart from an implied limited protection for Article III officials tantamount to the privilege implied under Article II, a strong prudential interest exists in favor of protecting the court and its judges from harassment and interference with the performance of their duties. As Judge Learned Hand has commented in another context, to hold otherwise "would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Gregoire v. Biddle* 177 F.2d 579, 581 (2d Cir.1949) (L. Hand, J.). The mandate of the Court of Appeals in this case must be read against the background of such cases as *Nixon* and *Gregoire* in exercising discretion as to whether Judge Lowe should be called as a witness.

The first point to be considered, however, is one of necessity. If there is no necessity to call the trial judge as a witness, a discretionary call weighing the implied Constitutional privilege to be free of subpoenas arising out of judicial duties against the degree of the necessity for the testimony is not required. Here there is no necessity. Accordingly, this Court has concluded not to call Judge Lowe to testify or to be cross-examined.

## Claim of Non–Compliance with Rule 615 F.R.Evid.

As to Judge Lowe's affidavit, movants (*see e.g.* Supplemental Memorandum of Nicholas Auletta at 8) object to a claimed non-compliance by this Court with Rule 615 F.R.Evid. in that this Court's written invitation to Judge Lowe to review the transcript of the new trial hearing (a public record, generated in open Court and on file in the public files of the Clerk's office) and then, if so advised, to submit her affidavit or advise this Court if she wished to testify, is a violation of Rule 615 of the F.R. Evid. concerning the exclusion of witnesses. The Rule reads as follows:

Rule 615. Exclusion of Witnesses

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

We begin our discussion by observing that the Rule, by its express terms, applies only to exclusion of the witnesses from the Courtroom "so that they cannot hear the testimony of other witnesses". The Rule has exceptions for parties, officers or employees of a party not a natural person, or for a person whose presence is shown to be essential to the presentation of the party's cause (*e.g.* an expert witness who has to hear the fact witnesses in order to form an opinion, or a case agent for the government in a criminal prosecution).

The Rule does not by its express terms prohibit an attorney sponsoring a witness from speaking to the witness at lunch, in the hallway, or at the end of a court day, to confront the witness with information including prior testimony of other witnesses which may stimulate or test the recollection of the witness, and

assure that the testimony to be given is well-considered and truthful, or to aid in framing questions. While some lower courts have assumed that the Rule extends to any kind of exchange of information with a witness concerning the prior course of a trial, we find no Second Circuit case directly on point which endorses such an absurd result.

■ Obviously, if Judge Lowe's testimony was identical with information already received, it would be merely cumulative, and no purpose would be served by this Court directing her to testify. Without knowing her response to the evidence already received, it would be impossible for this Court to make a meaningful decision as to whether she should be required to testify, a decision specifically entrusted to our discretion by the Court of Appeals. Furthermore, it will be recalled that the affidavits of the three jurors who seek to impeach their verdict were all originally presented to Judge Lowe in the form of a motion, so their contents came as no surprise. Any witness, including Judge Lowe, had full access to the public record conducted in open court including transcripts of our hearings on file in the Courthouse.

In short, the Court does not believe that Rule 615 F.R.Evid. should be extended beyond its plain meaning. Obviously any witness can be examined or cross-examined as to his or her credibility as to any transcripts, etc. which may have been read prior to testifying. *See* Rule 612 F.R.Evid. Such prior activity at most affects the weight of testimony rather than its admissibility. Even where Rule 615 F.R.Evid. has been expressly violated, or violated as extended by judicial construction to include matters taking place outside the courtroom, the remedy has been left to the discretion of the trial court and ordinarily does not involve striking out the testimony.

Movants' Rule 615 objection is overruled.

*Admissibility of the Tapes*

■ At the conclusion of four days of testimony, the Court allowed both parties to submit points and authorities on the limited issue of whether the tape-recorded conversations between the private investigator Raymond Glynn and the additional four jurors he interviewed, who did not submit affidavits in support of the motion, should be admitted into evidence as substantive proof. The Government's position is that this type of post-verdict hearing need not be governed by the Federal Rules of Evidence and that, therefore, hearsay statements are admissible. Assuming, *arguendo*, that the Federal Rules of Evidence do apply, the Government claims that the defendants consented to admitting the tapes both for impeachment purposes and as substantive evidence by failing to object when the evidence was proffered in Court. Failing that, the Government's final contention is that the tapes are admissible under Rule 803(24) of the Federal Rules of Evidence, the residual exception to the hearsay rule.

The defendants maintain that the hearing should be governed by the Federal Rules of Evidence. They argue that, although the tapes were admissible for impeachment purposes, the tapes are not admissible as substantive proof unless the tapes fall under one of the exceptions to the hearsay rule. According to defendants, none of the hearsay exceptions, including Rule 803(24), is applicable.

At a preliminary conference held on March 9, 1989, this Court made tentative rulings on how the evidentiary hearing would be conducted. For example, this Court followed the reasoning of *In Re Taylor,* 567 F.2d 1183 (2d Cir.1977), and ruled that the hearing should not be held *in camera:*

> *In camera* proceedings are extraordinary events in the constitutional framework because they deprive the parties against whom they are directed of the root requirements of due process.... Whenever the legal rights of individuals are to be adjudicated, the presumption is against the use of secret proceedings.

*Id.* at 1186.

The Government argued that the procedure approved in *United States v. Calbas,* 821 F.2d 887 (2d Cir.1987), should be employed here. In *Calbas,* the district judge

conducted an immediate post-trial inquiry to determine whether the jury had been tainted by certain extra-record information obtained by one of the jurors. The court heard testimony from ten other jurors *in camera* because the witnesses were jurors who had not expressed a willingness to come forward on behalf of the defendants. The interview of the jurors was conducted only in the presence of counsel, the private investigator, and a court reporter, and the court did not apply the Federal Rules of Evidence. The Second Circuit commended the court's handling of the matter: "[t]he court wisely refrained from allowing the inquiry to become an adversarial evidentiary hearing so as to minimize intrusion on the jury's deliberation." *Id.* at 896.

We distinguished *Calbas* from the instant case in part because of the representations made by defense counsel in this case regarding the willingness of three of the jurors to participate in a post-trial inquiry. In both their written submissions to the Court and at the first hearing, counsel for the defendants stated that the witnesses who would testify at this evidentiary hearing had agreed to come forward on behalf of the defendants. This representation turned out to be valid. Thus, the three jurors were not being compelled to return to court, against their will, after completing their jury duty. Rather, this was a case where the three jurors had submitted affidavits and had otherwise shown "their willingness to participate in further proceedings." Accordingly, this Court ruled that at least as to their testimony the hearing should be held in open court.

Next, we addressed the questioning of the witnesses. The Court ruled that the witnesses would be questioned by the movants' attorneys, followed by cross-examination and re-direct examination as governed by the Federal Rules of Evidence. The Court's role would be limited only to questions asked for the purpose of clarification. *See United States v. Ianniello*, 866 F.2d 540, 544 ("We leave it to the District Court's discretion to decide the extent to which the parties may participate in questioning the witnesses...."). As a result, this Court established adversarial standards for the conduct of the hearing which were in direct contrast to the informal inquisitorial proceeding held in *Calbas.*

Throughout the hearing itself, this Court stated that the Federal Rules of Evidence should apply "to the extent they are interpreted in this District and to the extent they are modified by the Judge Goddard Rule" (Tr. 627–629).[12]

The Government believes the tapes were admitted into evidence on consent (Tr. 202–204). When Mr. Glynn was examined, he agreed that the microcassettes contained his conversations with the jurors, and he explained his procedure for recording the jurors (Tr. 36–39). When the Government offered those exhibits into evidence on cross-examination, defense counsel did not object and the exhibits were received (Tr. 202–204). Defense counsel counters that although there was no contemporaneous objection to the admission of tapes, the proffer was made after the Court stated: "I'm not having any tapes *played* unless they are for the limited purpose of impeachment ..." (Tr. 97, emphasis added). Therefore, the defendants believed that the tapes were admitted only for impeachment purposes, not as substantive proof. The Court left the issue open when it stated: "I assume that the tapes are for the purpose of ... obviously for credibility and prior statements as they would be in any situation. I don't know if they are being offered for the truth" (Tr. 628).

**12.** It was the oft-expressed philosophy of Judge Henry W. Goddard of this Court (who served from 1923 to 1955) that a defendant in a criminal trial could adduce any "evidence" he or she wished to present to a trial jury. This was thought to provide greater fairness and minimize appellate reversals. Judge Goddard carried his rule to the ultimate extent when he permitted the witness Dr. Binder to sit in the second *Hiss* trial, which lasted from November 17, 1949 to January 21, 1950, and observe the mannerisms and conduct of Whittaker Chambers in the Courtroom, and then opine to the jury that Chambers was a pathological liar. The testimony was demolished on cross examination by the prosecutor, later Judge, Thomas F. Murphy. *See generally United States v. Hiss*, 88 F.Supp. 559 (S.D.N.Y.1950); 185 F.2d 822 (2nd Cir.1950).

In light of this colloquy, although this was a post-verdict hearing which perhaps did not have to adhere to the Federal Rules of Evidence, the Court, in fairness and to avoid surprise, should, consistent with its prior rulings decide the issue of the admissibility of the tapes pursuant to the Federal Rules of Evidence.

*Rule 803(24) R.F. Evid.*

The issue then becomes whether these tapes, which are clearly hearsay, fall under one of the exceptions to the hearsay rule. The only exception which appears to be applicable to this case, where the witnesses are available to testify (although as a matter of policy they should not be required to do so), is Rule 803(24), which provides that hearsay statements not otherwise included within any specific exception may be admitted if they have equivalent circumstantial guaranties of trustworthiness. Rule 803(24) provides:

> The following are not excluded by the hearsay rule even though the declarant is available as a witness:
>
> (24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is being offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will be best served by the admission of the statements into evidence.

This hearsay exception has been applied in a number of cases to allow into evidence statements that do not fit into any of the traditional and explicit exceptions to the hearsay rule. *See United States v. Medico*, 557 F.2d 309 (2d Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977); *United States v. Iaconetti*, 540 F.2d 574 (2d Cir.), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1976); *Robinson v. Shapiro*, 646 F.2d 734 (2d Cir.1981). The Court recognizes, however, that Rule 803(24) is not intended to be "a

broad license" to trial judges to admit hearsay, but rather, it should be used in rare and exceptional circumstances, keeping in mind that the trial judge should "exercise no less care, reflection and caution than the courts did under the common law in establishing the now-recognized exceptions to the hearsay rule." S.Rep. No. 1277, 93rd Cong., 2d Sess. 19, U.S.Code Cong. & Admin.News 1974, p. 7066.

One of the paramount concerns in a criminal trial is the cross-examination of witnesses. *See Sullivan v. Fogg*, 613 F.2d 465 (2d Cir.1980); *see United States v. Shakur*, 817 F.2d 189, 200 (2d Cir.1987), *quoting Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973) ("absence of cross examination 'calls into question the ultimate integrity of the fact finding process' "). When our judicial system was established and the requirement of an oath or affirmation on the part of a witness was borrowed from the British common law, the swearing of an oath meant something—namely, that the court could be fairly sure that a witness would tell the truth. In the time of our Founding Fathers, witnesses believed that they would be subject to severe and perhaps immediate Divine retribution if they lied under oath on the witness stand, based on the Ninth Commandment's proscription, handed down by God to Moses that "Thou shalt not bear false witness against thy neighbor" (Exodus, Ch. 20, Verse 16 (King James Version)).

Unfortunately, the sanctity of the oath taken by witnesses at trial has been significantly eroded and laced with skepticism in recent years. Yet it is still believed that the courtroom engenders an atmosphere conducive to truth-telling, for it is likely that upon being brought before such a body of neighbors and fellow citizens, and having been placed under a solemn oath to tell the truth under the temporal penalties of perjury, many witnesses feel obliged to do just that.

The fact that a witness takes an oath to tell the truth, however, does not necessarily mean that when he takes the stand he is going to tell the truth. We hope and ex-

pect that he will. But for different reasons or motives people have been known and will be known to lie. In light of this reality, cross-examination has come to be viewed as an acceptable means of getting at the truth. *See Spaeth v. United States,* 232 F.2d 776, 779 (6th Cir.1956) ("In our judgment, cross-examination is generally an even more effective factor in revealing truth than the oath of a witness"); *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (mechanisms of confrontation and cross-examination advance the pursuit of truth in criminal trials). Cross-examination does this generally by suggestive and leading questions which lead to inconsistencies or implausibilities and trap all liars but the most skilled and well-prepared.

■ The right to Sixth Amendment cross-examination now extends beyond the constitutional requirements of the Confrontation Clause. However, the Supreme Court has also made clear that while the hearsay rule and the Confrontation Clause "stem from the same roots," *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970), and "are generally designed to protect similar values," *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970), their reach is not co-extensive. *See Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972). The Sixth Amendment guaranty of confrontation, therefore, should not blind us to the reality that the question of the admission of hearsay statements at this point in history, whether in a criminal or civil case, turns solely on due process considerations of fairness, reliability and trustworthiness.

■ The tape-recorded interviews meet all the criteria set forth in the residual exception. The factors supporting admissibility include the fact that the interviews took place shortly after the trial ended, thereby assuring that the events of the trial and deliberations were still fresh in the jurors' minds. Mr. Glynn interviewed the jurors at great length. His years of police experience served him well, as he repeatedly probed the jurors by leading and suggestive questions and argumentative assertions of "fact" said, falsely, to have been corroborated by others previously interviewed.

The interrogation of the jurors possessed every characteristic of a thorough and exhaustive cross-examination as to whether any outside influence affected their deliberations. In each case, the non-affiant jurors, who had no reason to lie or distort the facts, either did not recall the incidents or expressly denied that they ever occurred. They did so repeatedly, despite wheedling and suggestive exhortation by Mr. Glynn. Indeed, Mr. Glynn admitted on cross-examination that each of the non-affiant jurors had, in fact, denied any knowledge of the alleged incidents (Tr. 105). Although the movants may not like the answers, there is no reason to doubt the trustworthiness of the statements. Therefore, the conversations on the tapes have sufficient indicia of reliability to be admitted under Rule 803(24).

This Court believes it would be highly unfair and a waste of judicial resources now to require these jurors to testify as a condition to the admissibility of these secretly-recorded interviews conducted by a hired investigator whose sole purpose was to elicit facts favorable to those who hired him and now object to the admissibility of his work. The reliability of the tapes and the thorough manner in which the jurors were interrogated leads us to conclude that no further questioning is necessary or productive. If any of these non-affiant jurors now testified inconsistently with the tapes, they would not be credible, and any such testimony would be impeached by the tapes. The circumstances concerning the statements on the tapes "provide a guarantee of trustworthiness equivalent to the exceptions to the hearsay rule." *United States v. Iaconetti, supra,* at 574; *see United States v. Ianniello, supra,* at 544 ("the rest of the jurors should be examined only if the district court conducting the hearing determines, in its discretion, that such testimony is needed.")

■ The defendants' final contention is that the tapes of the conversations are

inadmissible on authenticity grounds. Basically, the defendants now claim that the testimony of Mr. Glynn left serious doubt concerning both his competence and the ability of the tape recorder accurately to record the conversations. Defendants rely on *United States v. Fuentes*, 563 F.2d 527 (2d Cir.1977), a case where the Court of Appeals held that because "recorded evidence is ... susceptible to alteration, clear and convincing evidence of authenticity and accuracy must be present before taped evidence may be admitted." *Id.* at 532. The Court is satisfied that the tapes are accurate and trustworthy so that they may be received in evidence for substantive purposes.

Indeed, the taped interviews by Glynn of the non-affiant jurors are the most highly probative evidence in our entire record bearing on the main issue: Was the verdict tainted by improper ex parte contact with the jurors? Had the original motion papers considered by the Court of Appeals disclosed the existence of these four tapes and their content, it is highly likely that these hearings would have been considered unnecessary.

*Defendants' Motion to Call Remaining Jurors as Witnesses*

Defendants request that all remaining jurors be called to testify, and that they be placed under oath and subject to cross-examination.

■ The right of a criminal defendant to be tried by a jury is one of the most significant guaranties of our Constitution. Such a defendant has a right to a trial by an impartial jury, unprejudiced by extraneous influence, and when reasonable grounds exist to believe that the jury may have been exposed to such an influence, the inquiry must be broad enough to permit "the entire picture" to be explored. *Remmer v. United States*, 350 U.S. 377, 379, 76 S.Ct. 425, 426, 100 L.Ed. 435 (1955) ("*Remmer II*").

■ The defendants argue that this Court can only explore "the entire picture" by calling the remaining nine jurors to testify. However, the interest in allowing the defendants to explore all relevant surrounding circumstances concerning possible ex parte communications to the jury must be balanced against the conflicting but equally important interest in preserving the sanctity of jury verdicts and protecting jurors from harassment and intimidation. A post-trial hearing is not held to afford a convicted defendant the opportunity to "conduct a fishing expedition." *United States v. Moten*, 582 F.2d 654, 667 (2d Cir.1978) ("*Moten I*").

Courts traditionally have been reluctant to allow expansive post-trial reexamination of jury verdicts. *See United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989). "A juror must feel free to exercise his functions without ... anyone looking over his shoulder." *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1953) ("*Remmer I*"). Certain limits on post-trial inquiry into jury verdicts are also necessary in the interest of finality lest judges "become Penelopes, forever engaged in unravelling the webs they wove." *Jorgenson v. York Ice Machinery Corp.*, 160 F.2d 432, 435 (2d Cir.), *cert. denied*, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947), cited in *Moten I*, 582 F.2d at 664. If routine post-trial inquiries into what transpired during jury deliberations were permitted, "what was intended to be a private deliberation would become the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). "[N]o verdict would be safe." *Id.* at 268, 35 S.Ct. at 785 (citations omitted).

A juror is supposed to be able to give his or her verdict and go home. "Post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting jury room deliberation ... increasing temptation for jury tampering and creating uncertainty in jury verdicts." *United States v. Ianniello*, 866 F.2d at 543; *see Miller v. United States*, 403 F.2d 77, 82 (2d Cir. 1968); *United States v. Crosby*, 294 F.2d 928, 950 (2d Cir.1961), *cert. denied sub nom.*, *Mittelman v. United States*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962).

We are justifiably reluctant to bring jurors before the court again after they have reached a verdict and honorably performed their civic duty in order to probe for potential instances of bias, misconduct or extraneous influences. *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).

Seven of the jurors in this case have already been located, interviewed, manipulated and probed in a concerted effort to extract statements from them that could be used to impeach the verdicts. Without some showing of genuine necessity, the jurors who did not choose to enter the fray by making affidavits should not be called into court now merely to be harassed and intimidated, subjected to direct examination, cross-examination, redirect examination, and recross-examination, and to face the same persons whom they previously convicted of serious crimes.

The defendants' contention that "entire juries are routinely questioned," Defendants' Brief at 18, is an overstatement. In *Moten I*, the Court of Appeals remanded the case to the District Court and directed that the jurors be questioned regarding the facts surrounding a corrupt approach made to one or more of the jurors during the course of the trial. On remand, the District Court interviewed two jurors and determined that no further inquiry was necessary. The Court of Appeals affirmed in words prescient of this case, noting that "the factual underpinnings of this Court's prior concern collapsed under the weight of the evidence received at the remand hearing." *United States v. Moten*, 620 F.2d 13, 16 (2d Cir.1980) ("*Moten II*").

Similarly, the Court of Appeals in *United States v. Calbas*, 821 F.2d 887 (2d Cir. 1987), *cert. denied*, 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988), found "no substance in Calbas's suggestion that the District Court acted improperly in conducting a limited inquiry," asserting that it had previously stated that "the trial court has wide discretion in deciding how to pursue an inquiry into the effects of extra-record information," *Id.* at 896; *see United States*

*v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983), and "indeed has the power and the duty to supervise and closely control such inquiries." *United States v. Calbas*, 821 F.2d at 896; *Moten I*, 582 F.2d at 665.

The Court of Appeals opinion in this case expressly states that the scope of this hearing "should be limited to only what is absolutely necessary to determine the facts with precision." *United States v. Ianniello*, 866 F.2d at 544; *see Moten I*, 582 F.2d at 667. The opinion further stated that the other jurors should be called only if their testimony would be probative on the issue of "whether the jurors who heard the statements communicated the contents of those statements to the other jurors." *United States v. Ianniello*, 866 F.2d at 544.

That some of the four jurors who were interviewed and taped might change their story on the stand is a speculative argument insufficient to justify further inquiry. Such a change, should it occur, would be highly suspect and entitled to no weight. Further examination of the taped jurors would at most be merely harassing and cumulative in the context of the present record. Mr. Glynn intentionally avoided contacting the two "upstate" jurors because he believed that their responses "would not help the cause." There is no reason to believe he was incorrect in this assessment. No sufficient reason exists to disturb the privacy of the three jurors who refused to be interviewed. Relying on overwhelming precedent and strong policy arguments, we conclude that under the facts of this case, there is no need or justification to call the remaining jurors.

 On the totality of the evidence this Court concludes that there is no credible evidence that either Judge Lowe or Deputy Marshal Perrine interfered with the deliberations of the jurors or attempted in any way to influence or coerce the trial jury. Based on the proof adduced before me, neither this jury nor a "hypothetical average jury" would have been influenced, coerced, or led astray.

The motions for a new trial are denied. SO ORDERED.